## Gail (Goodrich) deBeaumont v. Mark D. Goodrich

[644 A.2d 843]

No. 92-586

Present: **Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.**

Opinion Filed May 27, 1994

---

94

*Norman R. Blais*, Burlington, for Plaintiff-Appellant.

*Peter F. Welch* of *Welch Graham & Manby*, White River Junction, for Defendant-Appellee.

*Charlene R. Bohl*, Chelsea, for Children.

**Dooley, J.** This is an appeal taken by plaintiff-mother Gail deBeaumont from a modification order of the Orange Family Court that shifted parental rights and responsibilities of the parties' children from Ms. deBeaumont to the defendant-father, Mark Goodrich. We affirm.

The parties were married for eight years before separating in 1990 and divorcing in August 1991. They had two children during their years together: Stephen, born in December 1985, and Molly, born in May 1988. Prior to separation, the mother provided care during the day for the children while the father worked, and both parents shared caregiving responsibilities during evening and weekend hours. After the separation, the mother returned to culinary school and worked periodically, with the parties splitting care. The children also continued to visit their paternal grandparents two to three times a week as they had been doing since birth.

Upon divorce, the mother was granted sole legal and physical responsibility for the children. The father was granted parent-child contact that allowed him to have the children for three days each week. This arrangement permitted continuation of the parties' practice of co-parenting. As part of the final decree, the court included a paragraph drafted by the parties stating: "If either party moves more than fifty (50) miles from their current homes in Thetford and Norwich, it shall constitute a change in circumstances so the Court may reconsider existing parental responsibilities and visitation."

On January 25, 1992, the mother chose to leave her home in Thetford and move to Milford, Pennsylvania, to join her companion, John Diefenbach. She consulted her attorney before doing so and was told that a move with the children would lead only to a reopening of parental-child contact issues, not a redetermination of all parental rights and responsibilities matters. Thereafter, the mother picked the children up from the father's home, and informed him for the first time that she and the children were leaving the state. She had not told the children they were moving to Pennsylvania, nor did she tell her

son's school that she was taking him out of state. The mother refused to give the father the children's mail address or telephone number for a week after the move and continued to refuse to give him her street address.

In response to a February 5 order of the family court, the children were returned to Vermont in early March. On March 25, the family court awarded the father temporary parental rights and responsibilities and gave the mother parent-child contact every weekend and Easter vacation. For purposes of assessing parental care, the court required a family evaluation. This evaluation was performed in May by Dr. Donald Hillman, who found that the children did not perceive either parent as the primary caretaker; rather, they considered both equally caring and committed. On August 24, 1992, the family court modified its earlier order and granted sole legal and physical responsibility to the father, subject to parent-child contact with the mother.

On appeal, the mother argues that the family court's decision to modify should be reversed because the court's findings were insufficient to warrant the modification, that the modification violated the teachings of *Lane v. Schenck*, 158 Vt. 489, 614 A.2d 786 (1992), and that it was error for the court to adopt many of the findings of the family evaluator but reach a conclusion contrary to the evaluator's recommendation.

In order to modify a custody determination, a moving party must traverse two hurdles. First, the moving party must make "a showing of real, substantial and unanticipated change of circumstances." 15 V.S.A. § 668. Once that threshold is met, the moving party must then show that annulling, varying or modifying a prior parental rights and responsibilities determination is in the best interests of the child.[1] *Id.*; see *Kilduff v. Willey*, 150 Vt. 552, 553, 554 A.2d 677, 678 (1988) (only if court finds substantial change of circumstances may it consider best interests of child).

In this case, the father argued that his burden to overcome the first hurdle was met by a provision of the divorce order, based on a stipulation of the parties, concerning the impact of either parent moving more than fifty miles from their respective homes in Vermont. The provision stated specifically that such a move "shall constitute a

---

[1] The concurring opinion urges that we collapse these two determinations into one in parental relocation cases. The two-step analysis is statutorily required and has no exception for relocation cases. However desirable may be the approach of the concurrence, we conclude it would require a legislative amendment to implement.

change in circumstances so the [family] Court may reconsider existing parental responsibilities and visitation." We agree that the provision provided the family court with a reasonable basis to find changed circumstances.

 There is no specific statutory authority for the divorce order to define changed circumstances for purposes of a future modification, nor have we considered such a provision. Without deciding whether such provisions will always be effective, we conclude that this provision was effective in this case for two main reasons.[2] First, it was based on a stipulation of the parties. The Legislature has provided that an agreement between parents concerning the division or sharing of parental rights and responsibilities is presumed to be in the best interests of the children. See 15 V.S.A. § 666. The changed circumstances provision was part of such an agreement and is entitled to that presumption. There is no reason to overcome such a presumption in this case.

Second, the provision established a reasonable benchmark to determine changed circumstances. Although physical responsibility for the children was awarded in the divorce decree to the mother, the time allocation for each parent was nearly equal so that a co-parenting arrangement was present.[3] Through the stipulation, the parties specified the limit to which their residences could be separated and still make the co-parenting relationship work. They agreed that if the distance limits were exceeded, the arrangement would break down so it would be necessary to reconsider the custody and visitation provisions in the divorce order. The specific distance standard enabled the parents to plan their lives with a clear understanding of the expectation of the other and the possible consequences of a decision to relocate.

 In reaching the conclusion that the provision provided a basis to determine changed circumstances, we want to distinguish the

---

[2] The issue is not, as the dissent argues, whether an agreement of the parties would be valid to confer jurisdiction on the court. This agreement is embodied in a court order and it is the order, not the agreement, we uphold. Moreover, the effect of the order was not to create grounds for modification where none existed. Instead, it was to specify the expectations of the parties with respect to their living arrangements at the time of the divorce. Such expectations represent the baseline for determining when changes are anticipated and are real and substantial.

[3] The characterization of the actual contact situation as a "co-parenting arrangement" was adopted from the evidence by the family court and, as a finding of fact that is not clearly erroneous, is controlling on this Court.

provision from one that would automatically change custody because of a relocation by the physical custodian. We would not give effect to an "automatic change" provision "because it is premised on a mere speculation of what the best interests of the children may be at a future date." *Hovater v. Hovater*, 577 So. 2d 461, 463 (Ala. Ct. Civ. App. 1990); see also *Wilson v. Wilson*, 408 S.E.2d 576, 579 (Va. Ct. App. 1991) ("predetermined" change of custody based on future move is an abuse of discretion). Here, the provision dealt only with the threshold; any changed custody had to be based on an independent assessment of the best interests of the children.

█ The mother argues that even if the provision is valid, it does not authorize a change of physical responsibility, as opposed to a change in visitation. The language of the provision covers both "visitation" and "parental responsibilities." Compare *Dunning v. Meaney*, 161 Vt. 287, 291, 640 A.2d 3, 5–6 (1993) (agreement that change in circumstances could necessitate change to "the visitation schedule" was not applicable to modification of parental rights and responsibilities). The changed circumstances determination applied to custody as well as visitation.

██ Even if there had not been a provision in the divorce order, we would uphold the family court's conclusion that the mother's move of the children from Thetford to Milford, Pennsylvania, was a real, substantial and unanticipated change of circumstances. There are no fixed standards for determining what meets this threshold. *Kilduff*, 150 Vt. at 553, 554 A.2d at 678. We have emphasized, however, that in order to ensure stability in the lives of the children, the burden of showing changed circumstances is "heavy." *Id.* Although relocation "often triggers jurisdiction under the modification statute," *Lane*, 158 Vt. at 496, 614 A.2d at 790, the physical custodian has a right to determine the child's residence, and relocation without more is not per se a substantial change of circumstances. See *Lenders v. Durham*, 564 So. 2d 1186, 1188 (Fla. Dist. Ct. App. 1990); *Smith v. Mobley*, 561 N.E.2d 504, 506 (Ind. Ct. App. 1990); *VanName v. VanName*, 419 S.E.2d 373, 374–75 (S.C. Ct. App. 1992). Any relocation will, as a matter of course, involve disruption and change in children's lives, but a court must not confuse its analysis of changed circumstances with its determination of the children's best interests. Rather, "'[w]hether or not any given change is substantial must be determined in the context of the surrounding circumstances.'" *Smith*, 561 N.E.2d at 507 (quoting *Poret v. Martin*, 434 N.E.2d 885, 890 (Ind.

1982)). Further, "it is the effect upon the child which renders a change substantial." *Ohman v. Ohman*, 557 N.E.2d 694, 696 (Ind. Ct. App. 1990).

We also emphasize that the "threshold decision for a motion to modify is discretionary," *Lane*, 158 Vt. at 494, 614 A.2d at 788, just as the initial parental rights determination is within the court's discretion, see *Myott v. Myott*, 149 Vt. 573, 578, 547 A.2d 1336, 1339 (1988). As a result, whether an initial determination or a modification, this Court "must affirm unless the discretion [was] 'erroneously exercised, or was exercised upon unfounded considerations or to an extent clearly unreasonable in light of the evidence.'" *Id.* (quoting *Jensen v. Jensen*, 141 Vt. 580, 581-82, 450 A.2d 1155, 1156 (1982)).

We upheld a trial court's determination of changed circumstances in *Lane* when the mother proposed to move to Iowa with the three minor children to attend graduate school. 158 Vt. at 494, 614 A.2d at 788. In that case, the father was entitled to visitation during alternate weekends and holidays. The change in circumstances is even more substantial here. Although the distance was greater in *Lane*, the distance is great enough in this case to prevent extensive visitation. Here, the mother unilaterally terminated the parties' co-parenting arrangement by removing the children to Pennsylvania. In so doing, she deprived the children of day-to-day contact with their father and with their paternal grandparents, subverting, as the trial court found, "[t]he financial, education, housing, and co-parenting plans agreed upon by the parties [which] had as a central element that [the mother] would be residing in the marital home in Thetford and that [the father] would be living in close proximity to her." Additionally, the son changed schools, leaving a school in which he was a recognized leader, and both children left a supportive community, which included their father's church community. The move triggered a breakdown in communication, and the father was unable to contact the children at all in the first few weeks. See *Day v. LeBlanc*, 610 So. 2d 42, 45 (Fla. Dist. Ct. App. 1992) (A move may constitute a substantial change of circumstances if the distance is far and the visitation of the other parent will be subject to significant interference as a result.). There was no abuse of discretion in finding changed circumstances.

Having met the initial hurdle of showing real, substantial and unanticipated changed circumstances, a parent moving for modification of custody still faces the burden of showing that a change in parental responsibilities is in the children's best interest. 15 V.S.A.

§ 668. As we discussed at length in *Lane*, a finding of changed circumstances does not alone mean that custody should be modified. See 158 Vt. at 496, 614 A.2d at 790. The residency decision of the custodial parent is entitled to deference and "giving stability to a child's life, to the extent possible under the circumstances, is so important that custody ought not to be modified without critical justification." *Kilduff*, 150 Vt. at 553, 554 A.2d at 678–79.

The trial court made extensive findings in support of its decision that it was in the best interest of the children to shift legal and physical responsibility to the father. We can summarize only the highlights of these findings. The most important finding was that prior to the mother's move neither parent was more "primary" than the other and that both were fit parents. The court found both parents to be dedicated, caring, sensitive, conscientious, moral and effective; and both have strong and natural bonds with the children. The children desired to stay together.

In favor of the father, the court found that he was content in a good job and has a steady disposition with the children. Custody with the father allowed the children to remain in a community, and in the case of the son a school, in which they had done well. It also allowed continuing contact with the parental grandparents, who had become very important in the lives of the children. The father was more likely to foster a good relationship between the children and the mother than vice versa.

The court emphasized the strong parenting skills of the mother and found that she has greater insight into her emotional problems than the father so that she "can provide emotional richness and variety to her children's lives in a way that [the father] cannot." It found, however, that the move to Pennsylvania was made solely for the convenience of her companion and was not done in a way to allow an orderly transition for the children. Overall, it found that the mother "has had difficulty gaining her own direction since the separation, which has led to a fairly high degree of instability in her life." It was concerned that the mother had allowed the companion to use corporal punishment on the children, although the mother was opposed to such punishment. The move weakened the mother's financial circumstances because she gave up a mortgage subsidy on her home in Thetford in order to move into an apartment costing $500 more per month although she earned only $5.25 per hour. The court found she was less willing than the father to foster cooperation and a positive relationship with the other parent.

Each parent exhibited some behavior which the court labeled as a risk factor. In each case, the court found that the behavior was not displayed before the children and thus did not affect the custody determination.

The mother faults the custody determination in three respects: (1) it is inconsistent with the decision in *Nickerson v. Nickerson*, 158 Vt. 85, 605 A.2d 1331 (1992), because it gives inadequate weight to her role as primary caregiver; (2) it is inconsistent with the standard for changing custody announced in *Lane*; and (3) it improperly deviates from the recommendation of the family evaluator. We take these claims in order.

The mother first argues that *Nickerson* and *Harris v. Harris*, 149 Vt. 410, 546 A.2d 208 (1988), direct the family court to determine who was the primary caregiver in the preseparation period, and to award custody to that person unless he or she is unfit. She argues that she was the primary caregiver both before and after the parties' separation.

The language on which the mother relies is in *Harris*:

> We do agree, however, that this factor should be entitled to great weight unless the primary custodian is unfit. The exact weight cannot be determined unless there is evidence of the likely effect of the change of custodian on the child. In the absence of such evidence, the court should ordinarily find that the child should remain with the primary custodian if that parent is fit.

*Id.* at 418–19, 546 A.2d at 214 (footnote omitted). She interprets *Nickerson* to hold that the period for determining the primary custodian is prior to the separation.

For three reasons, this argument is unavailing. First, the *Harris* and *Nickerson* decisions involve determining the physical custodian in the initial divorce decree. The question of who is the primary caregiver prior to separation, even assuming it can ever have the overwhelming weight the mother desires, cannot determine who should have physical responsibility in a modification decision. The whole point of the modification process is that changed circumstances may have made the initial decision inappropriate, so a reexamination of the interests of the children is warranted. See 15 V.S.A. § 668. To give special weight to the preseparation, predivorce caregiver would make modification unlikely even if circumstances had changed and the interests of the child clearly warranted modification. In short, it would introduce a factor irrelevant to those in the statute.

Moreover, the argument misreads *Nickerson.* In *Nickerson,* we specifically avoided a per se rule, "declin[ing] to follow the unyielding approach of some courts which bifurcate the pre- and post-separation periods in determining the primary-care-provider." 158 Vt. at 90, 605 A.2d at 1334. Rather, we held that a court's "inquiry should focus on all relevant periods of the child's life." *Id.* at 91, 605 A.2d at 1334. For purposes of a modification motion, of course, the most relevant period is that between the divorce and the filing of the motion to modify.

Second, the trial court specifically found that neither parent was the primary caregiver in the post-divorce period. The specific finding of the court was "neither [parent] is more 'primary' than the other, either by virtue of the quality of the care each provides or the amount of time each has spent providing it." Although the mother disagrees with this finding, it is supported by the evidence and is not clearly erroneous. The finding defeats her argument that the decision is inconsistent with *Harris* and *Nickerson.*

Third, *Harris* specifically decided that the weight to be given to primary caregiving is to be determined in light of the "effect of the change of custodian on the child." *Harris,* 149 Vt. at 419, 546 A.2d at 214. Only when there is no evidence of that effect should the court ordinarily find that the child must remain with the primary caregiver if fit. Here, there was extensive evidence of the effect of change in the lives of the children, including the effect of a change of primary custodian to the father. The court's decision analyzed the impact of change at length. The *Harris* analysis of the decision-making process in the absence of such evidence and consideration does not apply here.

The mother's next argument is that the trial court's decision is inconsistent with *Lane.* She stresses the standard *Lane* announced to modify custody because of a relocation: "To prevail, the noncustodial parent must prove that the children's best interests would be so undermined by a relocation with the custodial parent that a transfer of custody is necessary." *Lane,* 158 Vt. at 499, 614 A.2d at 792. She argues that the findings the court made in support of the modification would be true in any relocation case: the children would be removed from their former friends and classmates, it would be more difficult for the noncustodial parent to visit with the children, and there would be less contact with the parental grandparents. She emphasizes that *Lane* holds that she is entitled to determine the place of residence of the children, and the court may not second guess that determination. *Id.* at 495–96, 614 A.2d at 789–90. Therefore, she argues, custody cannot be modified because she exercised her right to determine the

residence of the children, and the normal consequences of that decision ensued.

█ This case arises in a context different from that in *Lane*, and that difference is critical to the application of *Lane*. In *Lane*, the court did not modify physical responsibility. It modified the divorce order to impose a condition that the mother not reside more than a four-hour drive from the father's residence. In essence, this order was no more than a "you may not move" order, and we rejected the court's failure "to show sufficient deference to the mother's decision to relocate." *Id.* at 491, 614 A.2d at 787. Specifically, we refused to "condone a process that substitute[d] the judgment of a court for that of the custodial parent merely because the court would have done something different if it had been the parent." *Id.* at 495, 614 A.2d at 789.

The mother is arguing here that *Lane*, although not directly about modification of custody, imposes a special standard for such modification in relocation cases. We disagree.[4] The modification statute imposes only one standard: whether modification "is in the best interests of the child." 15 V.S.A. § 668. As discussed above, because of the value of stability in a child's life, we impose a heavy burden on a noncustodial parent to show that the best interests of the child have so changed that the extraordinary step of custodial change is warranted. That burden is neither greater nor different in custodial-parent relocation cases.

█ Contrary to the mother's argument, four factors differentiate this case from the ordinary consequences of relocation and underlie the court's modification order. The most important is the co-parenting relationship, which meant both that the loss to the children from the relocation was very great and that the father was prepared to assume the responsibilities of custody with little modification of his life.

Second, the father's parents played an unusually strong role in the lives of the children. The family evaluator found:

> [The grandparents] appear to have been a strong source of nurturance and support over the years. They appear firmly and

---

[4] Both the concurring and dissenting opinions appear to accept this argument in part. If we understand their position, even if a change of custodian is found to be in the best interest of the children, the change should be denied in order to defer to the parent's relocation decision. Nothing in *Lane* or the statute, 15 V.S.A. § 668, says this. Nor is it justified by an attempt to shift the focus from the interest of the children to whether the mother is "labeled a wrongdoer." The policies developed in *Lane* are fully realized in the traditional two-step analysis for considering modification of custody awards.

positively bonded with the children, connections equally experienced by the children. They (and their rural setting) seem to have been a source of stability for the children.

The court adopted this finding. The relocation necessarily reduced the value of this resource to the children. The change of custody restored it in part.

Third, the manner in which the mother relocated was not in the best interest of the children since she did not prepare them for the move, and it unnecessarily interrupted their relationship with the father.

Fourth, the mother's actions since the divorce, and the reasons and consequences of the relocation, pointed to continuing instability in the lives of the children, as well as financial hardship. The father's life promised greater stability. See *Kilduff*, 150 Vt. at 554, 554 A.2d at 679 ("It is hard enough to give children of a broken home some semblance of an ordered life, while at the same time maintaining adequate contact with both parents, without subjecting them to the further disruption of moving to a new home . . . ."); *Wells v. Wells*, 150 Vt. 1, 5 n.*, 549 A.2d 1039, 1042 n.* (1988) (importance of stability in lives of children of divorced parents widely recognized).

■ The trial court has broad discretion in a custody matter; we cannot set aside its decision "because we would have reached a different conclusion from the facts." *Myott*, 149 Vt. at 578, 547 A.2d at 1339. The court made an extensive review of the custody factors set out in § 665(b) in evaluating the best interests of the children. It acknowledged the heavy burden on the noncustodial parent and required him to meet it. It emphasized the considerations other courts have used to order a change of custody in relocation cases. See, e.g., *Smith*, 561 N.E.2d at 507 (change of custody promoted stability in schooling, community, social, church and family relationships); *Schubring v. Schubring*, 476 N.W.2d 434, 436 (Mich. Ct. App. 1991) (stability and success in school); *KR(S)D v. CDS*, 646 S.W.2d 428, 431 (Mo. Ct. App. 1983) (family ties and support for visitation by noncustodial parent); *McMahon v. McMahon*, 607 A.2d 696, 702 (N.J. Super. Ct. 1991) (co-parenting); *Nichols v. Nichols*, 792 S.W.2d 713, 716 (Tenn. 1990) (close relationship between noncustodial parent and children). We do not agree with the dissent that the petition to modify should have been dismissed as a matter of law because no view of the evidence could support modification. We find no abuse of discretion. See *Dunning*, 161 Vt. at 289–90, 640 A.2d at 5 (as long as findings

reasonably support judgment, family court's decision must be upheld).

Finally, the mother argues that the court was in error for adopting findings of the family evaluator, Dr. Hillman, but making a modification ruling contrary to his recommendations. In fact, Dr. Hillman's main recommendation was that the parties attempt to reach a joint custody arrangement for the sake of the children. After discussing the benefits of a mediated custody agreement, Dr. Hillman stated that "[w]ith John [Diefenbach]'s support and involvement, together with individual counseling, [the mother] would seem to be in a slightly better position to be the parent with primary physical custody, if that *has* to be the case." After citing positive reasons for placing the children with the mother, such as her greater comfort with and knowledge of younger children than the father displayed, Dr. Hillman cited certain negative aspects of the mother's personality, such as the mother's dependency needs and insecurity that she was likely to project on to the children and the father. Dr. Hillman did note that the negative factors were actually a reason to keep the children with the mother, on the theory that losing physical responsibility would exaggerate the negative factors, and particularly the mother's inclination to charge the father with sexual abuse, charges which she had made in the past and had proved to be unfounded.

 The court may disregard the recommendations of the expert. See *Bissonette v. Gambrel*, 152 Vt. 67, 71, 564 A.2d 600, 602 (1989). The findings make clear that the court did not see the mother's companion as a resource to make her the better custodian. Indeed, the court specifically rejected consideration of the companion as a resource because he had "no legal obligation, family tie or emotional bond to the children." It also rejected that it should determine custody based on the mother's reaction to a loss of custody. In fact, the court found that the mother's stress over the divorce and separation from her children was a negative factor to be weighed against the father's ability to provide a stable home life and continuity in relations with the other parent. The court adopted many of the findings of the family evaluator, and considered his recommendation, but the ultimate responsibility to decide lies on the court, not the expert witness. There is no error in the use of the expert opinion.

*Affirmed.*

**Morse, J.,** concurring. I concur in the Court's result but for a different reason. I suspect that a modification-of-custody proceeding

is made more confusing given the two-prong test so often enunciated in the case law. The rubric of bifurcation surrounding the "modification" process is illusive generally and even more so in a case like this. The Court's twists and turns through it today does not help resolution of the dispute.

It would be preferable to decide a motion to modify by merging the jurisdictional "threshold hurdle" of *Kilduff v. Willey*, 150 Vt. 552, 553, 554 A.2d 677, 678 (1988), with the best interest test. After all, it is impossible to evaluate "real, substantial and unanticipated change of circumstances" without considering how the events and circumstances impact on the child's best interests.

That observation made, I depart from the Court's point of view and focus rather on the trial court's analysis, with which I agree. If the mother here had been the *unconditional* legal custodian (the parent with sole legal rights and responsibilities), *Lane v. Schenck*, 158 Vt. 489, 614 A.2d 786 (1992), would control. The mother's decision to move with the children to Pennsylvania would be entitled to deference and, even though the mother's reason for the move was exceedingly weak, her decision to move might have been—as the dissent so persuasively argues—protected under the standard announced in *Lane*.

In this appeal, however, we are not dealing with the usual sole custody situation. Mother's custody was conditioned by a stipulation:

> If either party moves more than fifty (50) miles from their current homes in Thetford and Norwich, it shall constitute a change in circumstances so that the Court may reconsider existing parental responsibilities and visitation.

The trial court stated:

> The financial, education, housing, and co-parenting plans agreed upon by the parties all had as a central element that Ms. DeBeaumont would be residing in the marital home in Thetford and that Mr. Goodrich would be living in close proximity to her.

The trial court held:

> In this case, Ms. DeBeaumont [had], by the Court's order, sole parental rights and responsibilities. However, *in reality* the parties had *shared* parental rights and responsibilities since the separation . . . .
>
> It was the parenting arrangement that gave the children's lives stability, not the designation of one as having sole parental rights and responsibilities.

(Emphasis added.)

In essence, then, the mother's move reopened the custody question as if it were governed by the usual considerations in awarding custody and was not governed by the more rigorous standard demanded in *Lane*.

**Johnson, J.,** dissenting. Today the Court decrees that a divorced parent with sole physical and legal rights and responsibilities for two young children may not exercise her judgment to relocate with the children to another state. The penalty for exercising her discretion, which the Court upholds, is loss of custody of her children. Because this decision is directly contrary to our recent holding in *Lane v. Schenck*, 158 Vt. 489, 614 A.2d 786 (1992), to the explicit statutory meaning of a custodial parent's rights and responsibilities, and to common sense and sound public policy, I must dissent.

## I.

Just two years ago, we reversed and remanded a trial court's decision on a petition to modify custody for failure to show "sufficient deference to the [custodial] mother's decision to relocate." *Lane*, 158 Vt. at 491, 614 A.2d at 787. In *Lane*, the father moved to modify custody when the mother announced her intent to attend law school in Iowa. Because the mother stated that custody was her first priority, the trial court did not modify custody. Instead, opining that the mother could just as well attend law school closer to home, the court conditioned the mother's right to retain custody on her remaining within a certain distance of the father's home. The order essentially enforced the status quo to preserve the father's visitation schedule. The court's rationale rested on its conclusion that it was not in the best interests of the children to move to Iowa because of the adjustment demands of a new community, the mother's busy schedule and what the trial court viewed as a deteriorating relationship between the children and their father.

Despite our own well-established appellate standard of review, that we will not substitute our own judgment for that of the trial court on custody and modifications of custody, *Myott v. Myott*, 149 Vt. 573, 578, 547 A.2d 1336, 1339 (1988), we reversed because we could not "condone a process that substitutes the judgment of a court for that of the custodial parent merely because the court would have done something different if it had been the parent." *Lane*, 158 Vt. at 495, 614 A.2d at 789. In other words, when a parent has sole physical and

legal rights and responsibilities, *Lane* teaches that it is the custodial parent who is entrusted to make decisions regarding where the family will live. *Lane* was supported by the Legislature's determination that a parent's rights and responsibilities include those "related to a child's physical living arrangements, parent child contact, education, medical and dental care, religion, travel and any other matter involving a child's welfare and upbringing." 15 V.S.A. § 664(1). See *Bancroft v. Bancroft*, 154 Vt. 442, 448, 578 A.2d 114, 118 (1990) (when custody is not joint, "it is in the children's best interest for one parent to have ultimate responsibility for directing their lives").

The *Lane* decision expressed sound reasons for deference to the custodial parent's decision to move. It obviates reconsideration of the custody issue, it maintains the children in the family unit to which they have belonged since custody was initially decided, it minimizes judicial interference with family decisions, and it places the decision with the person best able to consider the child's needs—the custodial parent. *Lane*, 158 Vt. at 495, 614 A.2d at 789.

As we recognized in *Lane*,

> [a]fter dissolution of a marriage, a new family unit, consisting of the custodial parent and children, is created. Allowing the new family to flourish is in itself conducive to the best interests of the children involved. . . . An appraisal of the custodian's decision to relocate should take into account both the family's needs in the short term and the family's benefit in the more distant future.

*Id.* at 498, 614 A.2d at 791 (citations omitted). Thus, preserving the location of the family in the name of stability should not necessarily be the ultimate goal of the family court.

In view of the interests that are implicated, and the fact that a change in custody, not location, involves a "violent dislocation," *Kilduff v. Willey*, 150 Vt. 552, 555, 554 A.2d 677, 680 (1988), the *Lane* standard for modifying custody when the custodial parent is relocating is high. "[T]he noncustodial parent must prove that the children's best interests would be so undermined by a relocation with the custodial parent that a transfer of custody is necessary." *Lane*, 158 Vt. at 499, 614 A.2d at 792. It is true, as the majority emphasizes, that the best interests of the children is the overriding standard in custody decisions, but the majority fails to recognize that *Lane* was intended to provide guidance for consideration of the best interests of children in relocation circumstances, and that a best interests determination should not be grounded on the disruption inherent in any relocation.

Today's decision trivializes *Lane*, rejects the sound public policy on which it was based, and provides zero predictability to litigants and lawyers about what to expect from the family court if custodial parents want to make new lives for themselves in a location other than that of the marriage.

Here, the majority uses the abuse of discretion standard to uphold exactly the kind of family court interference with lifestyle decisions that we condemned in *Lane* as an abuse of discretion. Although the majority gives lip service to the significant burden that a parent moving for modification of custody must meet, in fact, no burden was imposed at all. Rather, the mother was impliedly labeled a wrongdoer because relocating meant she was abandoning a "co-parenting agreement." The majority then upholds the view of the family court that because co-parenting was in the best interests of the children, the mother's actions in withdrawing from that arrangement were, per se, not in their best interests. Thus, it was the custodial parent who was required to justify her retention of custody, while the noncustodial parent was required to do no more than show that moving to another state would be disruptive to the children's lives.

## II.

Today's decision cannot be justified on the ground that the mother waived her right to contest whether there was a substantial change in circumstances by entering into a final divorce order containing the following provision:

> If either party moves more than fifty (50) miles from their current homes in Thetford and Norwich, it shall constitute a change in circumstances so the Court may reconsider existing *parental responsibilities and visitation.*

(Emphasis added.) This provision appears in what the majority characterizes as a "co-parenting agreement," which is merely a partial final order that was apparently based on a stipulation of the parties. It quite clearly awards physical and legal responsibilities, or custody, to the mother, and parent-child contact, or visitation, to the father. It sets forth the visitation schedule, which permitted visitation with the father from Wednesday evening to Saturday evening on alternate weeks, and Thursday evening to Sunday evening on the remaining weeks. But there is no language in the order that discusses "co-parenting" at all, and certainly not in the sense that the mother's custodial rights were to be diminished by the fact that the father

would have visitation three days per week. In short, it was not a joint custody arrangement.

It is simply not fair to imply a waiver of the mother's custodial rights on the language of this provision. First, the language is poorly drafted and does not indicate clearly that custodial rights will be implicated if a move is made. Indeed, the mother sought legal advice as to the meaning of the provision before she made the move and was told that visitation only would be reconsidered. Second, as reflected in the legal advice, the order incorporated two inconsistent concepts— one is that the mother is the custodial parent with all those areas of discretion ordinarily accorded to custodial parents by the statutes, including the right to choose the residence of the family—and the other is that the mother's custodial rights with respect to choice of residence are waived. Waiver should not be implied lightly, especially in view of the interests at stake here. *Eastman v. Pelletier*, 114 Vt. 419, 423, 47 A.2d 298, 301 (1946) ("A waiver is the intentional relinquishment of a known right, and since it involves both knowledge and intent, and its essence is a voluntary choice the party must have acted with a knowledge of all the material facts affecting his [or her] rights.").

Moreover, by allowing parties to define "real, substantial and unanticipated change of circumstances," the majority is taking what is essentially the unprecedented step of allowing litigants to confer subject matter jurisdiction on a court.[1] The family court is empowered to modify a custody order *only* "upon a showing of real, substantial and unanticipated change of circumstances." 15 V.S.A. § 668. The majority alters this test for modification by (1) concluding that any such provision has a statutory presumption of validity pursuant to 15 V.S.A. § 666, and (2) applying a "reasonable benchmark" test to determine the validity of the provision. The presumption is not supported by 15 V.S.A. § 666, which creates a "best interests" presumption for parental agreements regarding rights and responsibilities in the first instance—when the parties are divorcing—and does not apply to the circumstances of modification. Nonetheless, under the majority's scheme, the presumption lowers the statutory threshold showing of "real, substantial and unanticipated

---

[1] The Court tries to sidestep this effect by saying that the parties' agreement was embodied in a court order and it is the order that the Court upholds. *deBeaumont v. Goodrich*, 162 Vt. 91, 96 n.2, 644 A.2d 843, 846 n.2 (1994). This is a distinction without a difference. Courts routinely adopt the final agreement of the parties in the final order, as was done in this case.

change of circumstances" by allowing the parties to select a definition and then requiring the family court to uphold the definition if it is "reasonable." Thus the test collapses the two-tier inquiry of changed circumstances and best interests that 15 V.S.A. § 668 mandates.

The existence of a "real, substantial and unanticipated change of circumstances," however, is a jurisdictional prerequisite to consideration of the merits of a modification petition. *Kilduff v. Willey*, 150 Vt. at 553, 554 A.2d at 678 (such a finding is "a critical threshold finding, without which the court is precluded from considering the 'merits of the parties' claims' regarding the best interest of their child" (quoting *Hayes v. Hayes*, 144 Vt. 332, 335, 476 A.2d 135, 137–38 (1984))); see also *McCormick v. McCormick*, 150 Vt. 431, 436, 553 A.2d 1098, 1101 (1988) (under 15 V.S.A. § 661(e) (current version at 15 V.S.A. § 660), which permits modification of a child support order only upon the same showing required for modification of a custody order—"real, substantial and unanticipated change of circumstances"—"[t]he presence of a change in circumstances is a jurisdictional prerequisite to consideration of a petition to modify"). And it is axiomatic that "*[j]urisdiction over the subject matter of a suit cannot be conferred by agreement or consent of the parties when it is not given in law.*" *Suitor v. Suitor*, 137 Vt. 110, 111, 400 A.2d 999, 1000 (1979) (emphasis added). The majority abandons this longstanding principle even though doing so was unnecessary in light of its conclusion that even without consideration of the stipulation, father had met his burden.

This dicta, if followed, has several egregious implications in the child custody field. First, it undermines the very purpose for the high jurisdictional threshold for modification—to give "stability to a child's life." *Kilduff*, 150 Vt. at 553, 554 A.2d at 678. Second, it creates the anomalous result that parties can stipulate to the existence of changed circumstances but cannot stipulate to their absence. See *White v. White*, 141 Vt. 499, 503, 450 A.2d 1108, 1110 (1982) (parties may not bargain away court's authority to modify child support order). Third, this potential recognition of stipulations to changed circumstances injects a new bargaining chip to be used as leverage in divorce and custody negotiations. Finally, such provisions, even if written in language that applies to both parents, as here, are not mutually enforceable. Instead, the noncustodial parent is free to move beyond the mileage limit specified to seek better or different opportunities without the custodial parent's consent and regardless of the impact on the child. Meanwhile, the custodial parent has to restrict the family's movement to enable the noncustodial parent to exercise

parental rights or risk losing custody. For all of these reasons, the court deciding a modification petition should make an independent evaluation of whether the moving party has established a real, substantial and unanticipated change of circumstances before reaching the merits of the modification petition. Absent such a change, the modification court should not reach the question of whether a change of custodian is in the best interest of the children.

## III.

Assuming that father met the threshold showing for reconsideration of custody, he still had to meet the *Lane* standard for modification—whether the relocation so undermined the best interests of the children that a transfer of custody was necessary. I would hold that it was an abuse of discretion to conclude that father met his burden.

It is abundantly clear from the family court's findings and conclusions of law that, despite individual deficiencies, the mother and the father are both fit parents. What qualities each may lack as a parent are filled by the strengths of the other. All things being equal, this made the custody decision a difficult one. Unfortunately, it also tended to overemphasize as wholly negative all of the disruptions associated with relocating the family away from one of the parents. But there is nothing in this record to suggest that the children would not be safe and well cared for in Milford, Pennsylvania, or that they would not make an adequate adjustment to new schools and circumstances.[2] In short, the father did not come close to demonstrating anything other than that the move would be disruptive to his visitation. I do not imply that interference with visitation is to be disregarded out of hand, or that this father would not have suffered an emotional loss if he had not won custody of the children for whom he deeply cares, but interference with visitation is not the standard by which we ought to judge the custodial parent's relocation. Unless we expect to start granting modification orders routinely, there must be something more than an interruption to visitation, even when that is substantial.

---

[2] The majority refers to a finding of the family court indicating it was concerned about the use of corporal punishment by Mr. Diefenbach, with which the mother disagreed, but was apparently willing to allow. In fact, the finding acknowledges that a single incident discussed in the testimony did *not* result in corporal punishment being administered and that the concern was that the mother would not exercise "independent judgment." To the extent the same finding refers to "two occasions," unspecified, it is completely without support in the record and, I presume, simply a mistake.

The majority cites four factors that it claims differentiate this case from the ordinary consequences of relocation, and therefore justify the family court's interference. None of these reasons withstands analysis or meets the burden established in *Lane*. First, it found that the existence of the "co-parenting" relationship was the most important reason to uphold the trial court's decision. The majority reasons that because the father had three days of visitation per week, which may be more than the usual contact between the noncustodial parent and the children, the loss of parent-child contact from relocation is therefore greater. Whether or not this is a "greater loss" than in other cases, it is an irrational justification for depriving the children of the mother, who had the children four days per week.

The majority also contends that the visitation granted to the father meant that the father had demonstrated he was capable of handling custody. No one disputes in this case that both parents are fit custodians. The question is whether we should transfer custody from one fit parent to another simply because the parent with the legal right to decide where the children live effectuates a change. Obviously, if the father were not fit, the family court would have had no option to disapprove the mother's decision. Because the father *is* fit does not justify its intrusion here.

Most importantly, however, the notion that significant visitation imposes an obstacle to the custodial parent's right to move supports the worst possible public policy. We start with the proposition that if parents can agree to significant parent-child contact, it is obviously beneficial to the children. But, after today's decision, it would be poor legal advice to suggest agreement to such an arrangement to a custodial parent, unless that parent is confident that he or she will want to remain in the location of the marriage until the children reach majority. We recently upheld a family court decision in which exactly the opposite public policy was advanced to support a mother's move to take advantage of an educational opportunity, despite the fact that the parties had informally agreed that the father could have parent-child contact fifty percent of the time. *Dunning v. Meaney*, 161 Vt. 287, 290, 640 A.2d 3, 5 (1993). In *Dunning*, the father argued that he had become, de facto, a joint custodian and, therefore, a move out of state was a change in circumstances of such magnitude that custody should be modified. The family court disagreed, concluding that to "find a change in circumstances on the basis of increased contact would penalize [the mother] for her willingness to allow the contact." *Id.* at 290, 640 A.2d at 5. Today, this Court apparently takes the

opposite view in using significant parent-child contact as an obstacle to relocation.

Moreover, an agreement to share care of the children works only when parents can agree. When the arrangement is falling apart, as it was here, it makes little sense to rely on it as a continuing relevant factor.

Second, the majority also points to the unusually strong role played by the paternal grandparents in the lives of the children. Actually, the father's ability to handle custody was greatly enhanced by his parents, upon whom he was quite dependent psychologically and financially. Since the separation, the grandparents have shouldered the major custodial burden of the father's visitation. It is wonderful when children are able to draw on their relationship with grandparents as a resource in their lives, but to use a relationship with the grandparents to justify the transfer of custody from a fit mother, who has cared for these young children their entire lives, and, indeed, was the primary caretaker until the co-parenting arrangement,[3] cannot be our law.

Third, the majority emphasizes the manner in which the mother made the move. To be sure, the mother should have discussed the move with the father first, but should the penalty for that single omission be loss of custody? Although couched in terms of best interests of the children, that is the only conclusion one can draw after reading the record. In reality, even with notice to the father, the father would have moved to modify custody and we would have the same issue before us—whether the children's best interests were so undermined by a move to Milford, Pennsylvania that custody should be transferred. The penalty does not fit the crime.

Fourth, the majority points vaguely to "continuing instability in the lives of the children, as well as financial hardship." There is nothing in the record to support the statement that the children's lives with their mother would be unstable in Pennsylvania. They were enrolled in school and daycare, their emotional and physical needs were being met, and they received medical care when they were sick.

As to financial instability, the court's reference is to the mother's decision to move to Pennsylvania for a job that paid $5.25 per hour

---

[3] The majority makes reference to the fact that the parties here "co-parented" even before the divorce. The record reveals, however, that the mother was unquestionably the primary caretaker until the divorce. She cared for the children while the father was at work and when the father was regularly away for other activities, such as church meetings.

and to the loss of a mortgage subsidy on the marital home.[4] This conclusion is exactly the kind of second-guessing of lifestyle decisions in which the court should not engage. Was not this mother entitled to make the decision that a $300 per month mortgage subsidy was not worth remaining in a small town, continuing largely in the circumstances of the marriage, in the milieu of a religion that she rejected,[5] in disagreement with a former husband, in favor of a new start with a new partner, necessarily in a new location? Did not the family court engage in the same kind of "you are better off in Thetford" analysis as the family court in *Lane*? Even more troubling is the implication left by the majority opinion that we will support a mother's move to attend law school, but we will penalize a mother's attempt to terminate her dependence on public assistance by taking a low-paying job.

In spite of what I view in this case as unwarranted interference with an appropriate family decision by a fit parent, I recognize that the custodial parent's decision to relocate is not absolute. Certainly, family courts should not support the parent's exercise of discretion to relocate if it is motivated solely by an intent to frustrate the noncustodial parent's right to visitation. See 15 V.S.A. § 665(b)(5) (ability of parent to foster contact with other parent is a factor in custody decision). Nor should the custodial parent's decision to relocate the children to a place where their physical safety is seriously jeopardized be without review in the family court. Neither of those circumstances is present here. It is true that relocation often involves

---

[4] The testimony showed that the mother was on welfare because she was unable to find work in Vermont for some months. She filed applications with several banks in the area and with Grand Union. No work was available and she did not want to remain on welfare. She had begun a relationship with a new partner, John Diefenbach, who lived in Milford, Pennsylvania. The mother decided to look for work there. After spending a couple of days going to every store and business in town, she was offered and accepted a job as a bank teller at $5.25 per hour.

[5] During the marriage, the mother and father lived with their two children in the small community of Thetford. The father's parents lived in a nearby community, and the family belonged to the Christian Pentecostal Church, of which the father's father is pastor. The church tenets are built on a belief in the literal interpretation of the Bible, including the tenet that women are subject to the authority of their husbands. Although the father and his parents attempted to downplay this tenet in their testimony, they reaffirmed, on cross-examination, that in a dispute between husband and wife, the husband's authority is absolute. Although the mother was a member of the church, she came to reject this religion, and these religious differences contributed to the breakdown of the marriage. Moreover, the mother testified that she was dominated by the "male prerogative" in her marriage and was isolated "because of the church." She feared that her son and daughter were being raised in a religion where women were not given the same autonomy as men.

disruption in visitation, other local relationships and school. Unless *Lane* is completely meaningless, however, the fact that children will be uprooted from a community and visitation may be altered significantly cannot provide the justification for modification. We accepted in *Lane* that the pros and cons of the inevitable disruption are for the custodial parent to weigh, not the family court. In my view, the father produced insufficient evidence to warrant a change in custody from one fit parent to another.

Finally, I am troubled by the Court's willingness to abandon so quickly its effort in *Lane* to set some guidelines on the exercise of discretion in relocation cases, especially in light of the fact that such cases are proliferating. The lack of standards inhibits appellate review and does not provide the kind of predictability and stability that lawyers and litigants should expect from recent decisions. Without guidelines, we will quickly produce a hodgepodge of decisions with no consistent thread other than the "trial court did not abuse its discretion." The reality of this kind of decision-making is that very similar cases will result in very different decisions, and a custodial parent's ability to relocate will depend on the vicissitudes of individual judges. Because of factual differences in cases, we will always be forced to tolerate some inconsistency in decision-making, but we ought not to create the circumstances in which it will flourish.