### Karen Hoover (Letourneau) v. Wade Hoover

[764 A.2d 1192]

No. 99-084

Present: **Amestoy, C.J., Dooley, Morse, Johnson and Skoglund, JJ.**

Opinion Filed October 20, 2000

*Karen Ann Letourneau*, Pro Se, South Windsor, Connecticut, Plaintiff-Appellant.

**Morse, J.** In this custody dispute, mother appeals from the Rutland Family Court's modification order awarding sole custody of two of the parties' three children to father. The decision modified the parties' shared legal and physical parental rights and responsibilities.[1] Mother challenges the factual findings that served as the basis for the court's modification. We affirm.

The court concluded that both parents were actively involved in their children's daily lives following their divorce. Until August 1998, both parties resided in Rutland. Their divorce in 1996 did not result in any changes of schools or significant changes in routine for the children, with the exception of their sleeping slightly more often at mother's townhouse.

After the divorce became final, mother entered into a relationship with a man living in Connecticut. In April 1998, mother informed father that she intended to move with the children to Connecticut to live with him. Father objected to the move and, in July 1998, filed a motion to modify custody so that the children could remain with him in Rutland. Shortly after father filed his motion, mother moved to Connecticut. Soon thereafter, without father's agreement, she moved the two youngest children to Connecticut and enrolled them in school there.

---

[1] The parties reached a separate agreement with regard to their oldest child that does not modify the shared parental rights and responsibilities at the present time, but provides that she will continue to live in Rutland with her father while mother and father attempt to resolve their disagreement with regard to her custody.

■ In a decision dated December 18, 1998, after a hearing on the matter, the court concluded under 15 V.S.A. § 668 that mother's move to Connecticut constituted a real, substantial and unanticipated change of circumstances necessitating reconsideration and modification of the parties' legal and physical parental rights and responsibilities.[2] The court then considered the best interests of the children by weighing and balancing various factors under 15 V.S.A. § 665(b). It concluded that it was in the best interests of the children to return to Rutland and live primarily with father. Accordingly, the court ordered the children returned to father, granting him sole legal and physical custody. This appeal followed.

■ Mother challenges several of the court's conclusions as being clearly erroneous. She offers her own interpretation of the court's findings of fact and provides additional facts that were not in the trial court record in support of her arguments that the court's findings were erroneous. Our standard of review, however, is limited. A trial court's findings of fact must stand unless, viewing the record in the light most favorable to the prevailing party and excluding the effect of modifying evidence, there is no credible evidence to support the findings. See *Highgate Assocs., Ltd. v. Merryfield*, 157 Vt. 313, 315, 597 A.2d 1280, 1281 (1991). Furthermore, our review is confined to the record and evidence adduced at trial. On appeal, we cannot consider facts not in the record.[3]

---

[2] Because she discussed her intentions with father on several occasions, mother takes issue with the court's characterization of the means by which she moved the children to Connecticut as "deceptive." The accuracy of this characterization, however, does not control the determination that her move amounted to a real, substantial and unanticipated change of circumstances. Circumstances or arrangements are "unanticipated" if they were not expected at the time of divorce, see *Lane v. Schenck*, 158 Vt. 489, 493-94, 614 A.2d 786, 788 (1992), which was the case with mother's move to Connecticut.

[3] It appears that some of the "uncontested evidence" referred to by the dissent is partially comprised of facts that mother brought forth in her brief but do not appear in the record with specificity, including, for example, the fact that prior to her move, mother saw the children after school before they went to their father's house; or that the mother discussed her move to Connecticut with the children and father contemporaneously. While these facts would have been mitigating evidence with respect to the evidence presented by the father at trial, they appear in an unsworn statement and were never before the trial court. Therefore, we cannot consider them. To the extent that the dissent cites to the record for support, the testimony cited is equivocal, especially considered in light of contrary testimony by father. It is not this Court's role to second-guess inferences drawn by the trial court from equivocal evidence.

As an initial matter, the custodial underpinning of this case should not be equated with that of *Lane v. Schenck*, 158 Vt. 489, 614 A.2d 786 (1992). *Lane* involved a judgment granting sole physical and legal parental rights and responsibilities to one parent, and neither party in that case disputed the fact that the mother had continued to be the sole custodian following the divorce. We noted that when a *noncustodial* parent seeks a change in custody based solely on the *custodial* parent's decision to relocate, the moving party faces a high hurdle in justifying the "violent dislocation" of a change in custody from one parent to the other. See *id.* at 499, 614 A.2d at 792 (quoting *Kilduff v. Willey*, 150 Vt. 552, 555, 554 A.2d 677, 680 (1988)). We also observed "[t]he place of residence for a family is central to childrearing, and thus that decision is understandably entrusted to the parent awarded parental rights and responsibilities." *Id.* at 495, 614 A.2d at 789. However, when childrearing and its concomitant decision-making are shared, relocation to a remote location by one parent requires at the very least a reassessment of the custodial arrangement and, because of the practicalities involved in shared parenting, will often necessitate a change in custody. This result is further compelled when the parties are no longer able to engage in shared decision-making because of a deterioration in their parenting relationship.

This case involves a prior divorce judgment providing for *shared* legal and physical parental rights and responsibilities.[4] Furthermore, the court's factual determination that the parties continued to share custody up to the time mother moved to Connecticut is supported by the evidence presented at the modification hearing. Cf. *deBeaumont v. Goodrich*, 162 Vt. 91, 105, 644 A.2d 843, 851 (1994) (Morse, J., concurring) (co-parenting relationship which made neither party primary care giver most important factor that differentiated case from *Lane*). Because mother and father were unable to resolve their

---

[4] To the extent that the dissent argues it, our decision in *deBeaumont v. Goodrich*, 162 Vt. 91, 644 A.2d 843 (1994), does not stand for the proposition that a trial court or this Court should disregard a valid divorce order when making a determination regarding modification of parental rights and responsibilities, especially when it appears that the parties have adhered to the parenting arrangement reflected in that order. In *deBeaumont*, we noted that although the divorce order granted sole legal and physical custody to the mother, the time allocation found *within the divorce order* more closely reflected a co-parenting relationship that was borne out by the facts in that case. *Id.* at 94, 96 & n.3, 644 A.2d at 845, 846 & n.3.

conflict and reach an agreeable arrangement that would enable them to continue co-parenting, a disruption of the custodial arrangement in this case was inevitable. The trial court was merely in the position of deciding what was in the best interests of the children: sole custody with mother or sole custody with father. Cf. *Lane*, 158 Vt. at 499, 614 A.2d at 792 (where one parent has sole custody, trial court is faced with decision to *continue* the current custody arrangement or to order *change* in custody based solely on custodial parent's decision to relocate).

The findings of fact upon which the court based its award of sole custody to the father include the following: Father had a slightly more active engagement in the children's lives, including helping them with their homework, having dinner with them on a regular basis and involving himself in their extra-curricular activities. He placed the interests of the children first, whereas mother blended her perception of her own interests with those of the children, describing the children's best interests as coextensive with and dependent on her personal happiness. Father was more committed to providing a long-term, stable home environment, while the future of mother's new relationship was unsettled and the new home she offered untested. Although the children seemed to have made a reasonable adjustment to their new school, one child's grades had slipped. The children were familiar with the home, community and school in Rutland. In addition, the children's older sister and maternal grandparents resided in Vermont.[5] The court was also concerned about the manner in which the children were moved to Connecticut and their involvement in the process.

These findings all find support in the trial court record. Father testified that he had dinner with the children every week night but Tuesdays and would then help them with their homework before they returned to their mother's house for bed. This testimony was corroborated by the mother's testimony that when the children returned at night, their homework would either be completely

---

[5]The dissent mischaracterizes the trial court's finding on this point as a determination that father was in a better position to foster a relationship with mother's extended family. In fact, the trial court merely found that, because both maternal grandparents live in Vermont, living with their father in Vermont would allow the children more opportunities to see their grandparents.

finished or at least partially completed. Father testified that he attended all the children's sports games, but that mother attended only occasionally and often would not stay to the end of the game. He noted that mother failed to attend one of the children's baseball banquets. With respect to the parents' consideration of the children's best interests, father indicated that he had declined a promotion at work because it would entail hours that would interfere with the time he spent with the children. With regard to the manner in which mother moved the children to Connecticut, the father gave uncontested testimony that mother inaccurately led him to believe that she was merely taking the children to Connecticut for their weekly time with her, but that she would be returning them to Vermont at the usual transfer time. Without listing further testimony at length, there is credible evidence in the record to support the trial court's findings, most importantly the findings on which the court relied in making its disposition.

The trial court determined that both parents in fact shared parenting responsibilities. Because of mother's move, however, and the breakdown in the parties' ability to co-parent the children, the court was forced into the position of awarding sole custody to one parent or the other. After appropriately and carefully weighing the factors used when determining the best interests of the children, the trial court found that living in Vermont with their father was favored over living in Connecticut with their mother.

█ It is not what appellate judges would have done had they been the trier of fact that governs in an appeal. See *deBeaumont*, 162 Vt. at 103, 644 A.2d at 850 (quoting *Myott v. Myott*, 149 Vt. 573, 578, 547 A.2d 1336, 1339 (1988)) ("[W]e cannot set aside [a trial court's] decision 'because we would have reached a different conclusion from the facts.'"). The trial court's findings are supported by the record evidence. To the extent that mother offers additional information, this information is not of record and may not be considered on appeal. Therefore, we cannot say that the trial court's findings of fact are clearly erroneous. While this is a close case and, as the trial court recognized, "both parents are capable of being the primary parent for the children," mother has not shown that the court abused its discretion by granting father sole legal and physical custody of the

children based on its findings of fact.[6]

*Affirmed.*

**Johnson, J.,** dissenting. I am unable to join the majority's decision affirming this award of custody because of substantial errors in the trial court's findings of fact. All of the major findings that affected the trial court's interpretation of the evidence and that supported its ultimate decision are either without support in the record or contrary to undisputed evidence. The errors are so serious that no deferential standard of review can save them, and the opinion should be reversed. With this degree of error, it is impossible to view the contested custody hearing as having been fair to both parties. This reason alone is enough to compel my dissent.

But the majority's decision also ignores, under the cloak of our deferential standard of review in family cases, that the role of an appellate court is to provide broad guidance to the trial courts on the direction of the law. This particular modification of custody occurred because one of the parents moved from Vermont to Connecticut. This is a controversial area of family law that has commanded thoughtful consideration by commentators, the American Law Institute, and state appellate courts. We, too, have struggled with these issues, as shown by our decisions in *Lane v. Schenck,* 158 Vt. 489, 614 A.2d 786 (1992), and *deBeaumont v. Goodrich,* 162 Vt. 91, 644 A.2d 843 (1994), and as those decisions demonstrate, the issues are not easily resolved. But it is wholly untenable, in my view, to resolve the issues solely by

---

[6] We do not take issue with the dissent's observation that "[t]he standards proposed by the American Law Institute in its Principles of the Law of Family Dissolution . . . thoughtfully consider the risks and rights at issue in relocation cases." 171 Vt. at 272, 764 A.2d at 1202. The adoption of these proposed standards simply is not before us. The ALI's proposed standards were not argued below, considered by the trial court or mentioned in the briefs. Additionally, applying the ALI analysis for joint custody would arguably yield the same result in this case. If anything, the trial court might not have reached the best interests inquiry because of a failure to meet the first requirement, good faith, based on the manner in which mother moved the *children* to Connecticut. According to father's uncontroverted testimony, the weekend she moved the children permanently to Connecticut, mother led him to believe through communications via the children that she would be returning with them to Vermont for their usual Tuesday-night transfer. In fact she failed to do so and instead enrolled the children in school in Connecticut. Cf. *deBeaumont,* 162 Vt. at 98, 644 A.2d at 847 ("[T]he mother unilaterally terminated the parties' co-parenting arrangement by removing the children to Pennsylvania. In so doing, she deprived the children of day-to-day contact with their father . . . subverting, as the trial court found, '[t]he financial, education, housing, and co-parenting plans agreed upon by the parties . . . .'") (second alteration in original).

deference to the trial courts. That is a strategy that results in greater variability than we should countenance among trial courts when divorced parents relocate. Because there are better standards for deciding these cases that I believe we should adopt, I respectfully dissent.

## I.

The scope and significance of the trial court's errors require reversal. I address only those errors most material to the court's ultimate decision to award custody to father.[1] Even limited to the three types of error outlined below, the lower court's decision cannot stand.

Our review of the trial court's findings of fact is deferential. The court's findings of fact are reviewed for clear error and will be upheld if supported by credible evidence. See *Brown v. Whitcomb*, 150 Vt. 106, 109, 550 A.2d 1, 3 (1988). As an appellate court, however, we are not required to accept findings that are wholly without support in the record. See *deBeaumont v. Goodrich*, 162 Vt. at 98, 644 A.2d at 847 (this Court need not affirm trial court decision that is "'clearly unreasonable in light of the evidence'") (quoting *Jensen v. Jensen*, 141 Vt. 580, 581-82, 450 A.2d 1155, 1156 (1982)). Nor are we required to accept findings that are directly contrary to uncontested evidence. See *Kopelman v. Schwag*, 145 Vt. 212, 214, 485 A.2d 1254, 1255 (1984).

Given the majority's cursory review of the facts in this case, it is necessary to spend some time laying out what the evidence at trial showed. Karen Letourneau and Wade Hoover married and had three children: Angela, now age 14, and Cory and Alisha, twins age 12. In 1994, mother and father separated. They ultimately divorced in April

---

[1] There are literally dozens of errors in the findings, the vast majority of which I cannot detail at length. The errors include findings that: father cared for the children before school; father was more involved in routine parental activities; father made arrangements for medical appointments; father maintained communication with the children's teachers; only father was involved in the children's sports activities; mother did not have information about the children's daily lives in Connecticut; mother could not distinguish her own interests from those of the children; mother's life in Connecticut was not stable; mother and new husband did not intend to return to Vermont; mother refused to mediate the issue of the move; the children expected to start school in Vermont; mother told the children about the move before she told father; mother was not truthful with the children about the move; mother ignored the divorce order; mother failed to pay for the children's lawyers; mother's new husband does not have a good relationship with the children; and finally, that father will be better able to foster a relationship with *mother's* relatives than will mother. These findings are either unsupported by any credible evidence or directly contrary to uncontested evidence.

1996. The final order of divorce incorporated their agreement for joint physical and legal responsibility for their three children. It also provided that if either parent moved out of Vermont, the remaining parent had the right to petition the court to modify its order. In April 1998, mother told father that she intended to move to Connecticut with her fiancé and wanted to move with the children. She tried repeatedly to talk to father about the move but he refused. In July, father filed a motion requesting the court to prevent mother from moving. Mother moved in July or August and took all three children with her. The children visited their father in Vermont on weekends for the rest of the summer. At the end of August, after fighting bitterly with father about where the children would start school, mother picked up the twins in Vermont, leaving Angela in Vermont to attend a party. No return transfer took place; the twins started school in Connecticut and Angela started school in Vermont.

The court held an evidentiary hearing on November 25, 1998. At the hearing, both parents agreed that they wanted Angela to be able to finish the school year in Vermont. It issued its decision on the custody of the twins on December 18, 1998. The court's decision seems to turn on its findings that father had spent more waking hours with the children and had been "slightly" more actively involved in their lives. The court made a number of findings about father using the statutory factors but failed to make corollary findings about mother, effectively presuming that father was the primary parent and finding that there was no reason he could not continue to be the primary parent. Thus, the court awarded sole legal and physical custody of the twins to father.

## A. Amount of Time Spent in Caregiving

First and foremost, the court erred in its findings related to how much time the children spent with each parent. The court believed that little had changed in the years since the divorce and that the schedule outlined in the divorce order was still essentially being followed. Under that order, father, who worked a night shift, cared for the children during the day and mother cared for them at night. Uncontested evidence established that in the year before the hearing the children lived with mother, saw her before and after school, took the school bus to and from her house,[2] and slept there every night.

---

[2] The majority claims that evidence of these uncontested facts does not appear in the record. These facts, however, come directly from the hearing before the trial court.

They saw father for dinner three nights a week and spent alternate weekends with him. While this was not the schedule specified in the divorce order, both parents testified that this was the schedule they had been following for at least a year. The schedule had changed, both parents testified, because father got a day job and no longer was available to take care of the children before or after school.

Although father claims that he objected to the changes and the court credited his testimony that he "was not happy" about the changes, it is undisputed that he went along with them. In the court's words, he "lived with it." Whatever his private feelings may have been, as a matter of law, father acquiesced in the changes and cannot now object. See *Brown v. Brown*, 134 Vt. 412, 414, 365 A.2d 248, 249 (1976) (acquiesced-in change in custody cannot form basis to modify court's order because it was not outside plaintiff-parent's control). He cannot rely on his unhappiness to preserve his rights under the original order. See also *deBeaumont*, 162 Vt. at 94, 644 A.2d at 845 (where court found that neither parent was primary, de facto custody arrangement controlled, rather than court order of sole custody to mother).

The court's mistaken understanding of the schedule led to its erroneous finding that the children "spent more of their waking time, the time between the end of the school day and bedtime, with their father." This finding also uses the wrong measure of waking hours by looking only at the after-school hours rather than at *all* the children's waking hours. Based on the undisputed evidence, it is apparent that father spent about nine hours per week with the children (excluding his weekends, which time was equal to mother's weekends). Mother spent more than twenty waking hours with the children every week. Even assuming they saw mother only for one hour before school, one hour after school, and an hour before bedtime (conservative estimates of the time needed to ready children for school and for bed), those hours total fifteen. Those fifteen hours must be added to dinners on Sundays and Tuesdays, for a total of at least twenty waking hours per week (excluding mother's weekends). No possible construction of the evidence can support a finding that father had more waking-hours time with the children than mother. This critical finding is therefore clearly erroneous.

As dictated by our decision in *deBeaumont*, the family court must look at the "actual contact situation" in its determination. See

(November 25, 1998 Tr. 26, ln 12-16; 78, ln 23-25; 79, ln 3,4; 80, ln 3-5, 13-15, 25; 81, ln 1-2.)

*deBeaumont*, 162 Vt. at 96 n.3, 644 A.2d at 846 n.3. Instead, the court decided, erroneously and under an inappropriate standard for deciding the case, which parent had a slim majority of custodial time. The court's findings focus on which parent was "slightly more involved in routine daily parental responsibilities" and which parent had a "slightly more active engagement in the children's lives." Then, it used this fictional primacy of the father to find a quasi-custodial parent and create a presumption that the "custodial parent" should retain custody.[3]

In reality, the reduction of contact with father down to nine hours per week has fundamentally altered the joint custody that existed at the time of divorce. Mother appears to have become the primary parent, with the children having significant visitation with father. Title 15, § 665(a) refers to the court's duty to award parental rights and responsibilities "primarily or solely to one parent" where the parents cannot agree on joint custody. The statute thereby explicitly recognizes what we have further acknowledged in our cases, that "some sharing of responsibilities, short of joint custody" may exist. See *Gazo v. Gazo*, 166 Vt. 434, 443, 697 A.2d 342, 347 (1997). That is the situation evident here; the children lived with mother, saw her before and after school and were put to bed by her. She arranged for medical care, communicated with their schools, helped them with homework, and for nine hours a week they visited with father. This arrangement of "actual contact" ought to have been granted deference by the family court under *deBeaumont*, and its failure to do so was error. The schedule testified to by both parents at the hearing suggests that mother may indeed, as she claims, have become the primary care giver during the years after the divorce.

---

[3]The court made numerous findings about father's efforts and contributions to caregiving without making any comparative findings about mother. Many of these findings are wholly without support in the evidence, and others are simply useless because there is no comparison — the court made no corollary findings about mother that support its decision to deny her custody. The findings that demonstrate the court's presumption include that father: has a successful work history; has turned down promotions that would have limited his time with the children; has secured flexibility in his work to allow him to take care of the children; actively supports the children's activities and attended all of Cory's baseball games; took the children school shopping before the move and thought that they expected to start school in Vermont; provides the children with dinner on a regular basis; helps the children with homework; and that he never shortcut any of his responsibilities. Additionally, the court found that: father's relationship to the children was more significant than their relationship with mother's fiancé; the children's roots were deeper in Rutland; and that father's situation in Rutland offers greater stability.

## B. Involvement in the Children's Lives

The court next found that father had "a slightly more active engagement in the children's lives." The court cited as support for this finding the fact that father cared for the children before and after school, was involved in their activities, fed them dinner and helped with their homework. The above analysis reveals that father cannot be credited with spending a greater quantity of time with the children; therefore the first basis for this finding is without support in the evidence.

Further, it was uncontested that both parents helped the children with homework. The court, however, only made a finding that father helped them, thereby privileging his assistance and failing to fairly consider mother's involvement. The evidence does not support a finding that father was *more* involved with the children than mother when both he and mother helped them equally with homework.

The court also cited as support for its conclusion about father's involvement a finding that father made medical appointments. This finding is clearly erroneous; there is no evidence whatsoever that father had anything to do with the children's medical care.[4] The only evidence regarding father's involvement in medical care was that he had failed to provide insurance coverage for the children since the divorce, despite being required to do so. The undisputed evidence demonstrated that mother provided medical coverage and secured medical care for the children with little or no involvement on father's part.

Similarly, the court found that both parents had "maintained constructive communication with the children's teachers," but there is no evidence to support finding that father did so. The evidence showed that mother attended parent-teacher conferences and guidance counseling sessions but that father had refused to attend these conferences. There was no evidence, therefore, that father maintained *any* communication with the children's teachers.

A separate finding faults mother because, the court says, she "did not have very much information about plans for the children's daily

---

[4] Mother testified about which doctors she had taken the children to in Vermont (as well as those she had provided for in Connecticut) and further testified that she took the children to the dentists and scheduled their appointments. In addition, mother testified about arranging for the children's medical coverage through the Dr. Dynasaur program in Vermont. Father was required under the final divorce order to provide medical coverage for them but conceded at trial that he had failed to provide medical coverage for them for at least several years.

lives or activities in Connecticut." This finding is wholly unsupported. Mother testified at length about the children's schools in Connecticut, about their successful adjustment to it, their choices about extracurricular activities there, the family's hobbies and their plans. This finding is clearly erroneous and cannot stand.

These multiple errors taken together eviscerate the court's ultimate finding that father was more involved with the children. The flaws in the underlying findings greatly compromise the conclusion that father's custody is in the best interests of the children. He did not spend more waking hours with them than mother did, nor was he more involved than mother in their lives.

## C. Mother's Relocation

In its decision, the court revealed that its "greatest concern" was the way the mother dealt with the move to Connecticut. This set of errors relates to the court's findings about how mother told the children and father about the move, the significance of the divorce order provision regarding relocation, and the fact that the parents did not mediate the issue of the move. The court's disapproval of mother's behavior toward the children flows from a central mistake. The court believed that mother put the children "in the middle" because it believed she told the children about the move before she talked to father about it. The only evidence about the timing of these conversations was that they took place around the same time;[5] therefore, there is no support for the court's finding that she put the children in the middle or was somehow deceitful.

Regarding mother's conduct toward father, the court blames mother for the fact that she moved without reaching an agreement with father. The court fails to consider, however, that their divorce order simply required the moving party to give sixty days' notice of a planned move and permitted the nonmoving party to request modification. Mother notified father of the move in April, months before the move sometime in late July or August. That was all she was required to do. Father had the right to ask the court to change custody, and he did not avail himself of that right until July.

Furthermore, the court mistakenly blames mother for refusing to mediate the move when in fact it was father who had repeatedly

---

[5] Again, the majority claims there is no support for this fact in the record, and again supporting statements come directly from the hearing before the trial court. (November 25, 1998 Tr. 68, ln 4-8; 96, ln 12-16.)

refused to mediate. He admitted at trial that he thought there was "nothing to mediate," that he had no intention of negotiating. The court then put these words into mother's mouth and "found" that mother thought there was "nothing to mediate." Instead, mother had tried repeatedly to talk to father but he simply ignored her. It is hard to imagine what more mother could have done in this situation; she gave notice well in advance of the move, and she attempted to mediate. She played by the rules and father refused to abide by the divorce order to mediate, yet the court blames mother.

The errors in findings resulted in errors of law. By erroneously finding that the parties had a shared custody arrangement, rather than mother as custodial parent and father as noncustodial parent with visitation, mother was not given the benefit of our holdings in the two leading relocation cases we have decided.

In *Lane*, 158 Vt. 489, 614 A.2d 786, we established certain principles with respect to relocation cases. In *Lane*, a mother with sole custody who decided to move to Iowa for law school was ordered by the court not to move more than four hours drive away from the noncustodial parent. See *Lane*, 158 Vt. at 491, 614 A.2d at 787. We reversed, finding that although the court had been correct in finding a real, substantial and unanticipated change in circumstances, courts must grant "some level of deference" to a custodial parent's decision to relocate. See *id.* at 495, 614 A.2d at 789 (citing *Auge v. Auge*, 334 N.W.2d 393, 399 (Minn. 1983)). Therefore, we held that where a custodial parent wants to relocate and the noncustodial parent shows changed circumstances, the noncustodial parent must further show that the move would so undermine the best interests of the children that a transfer of custody is necessary. See *id.* at 499, 614 A.2d at 792. In *Lane*, we reversed the court's prohibition on the mother's move and remanded for the court to find whether the move so undermined the best interests of the children that a transfer of custody was needed. See *id.* In essence, *Lane* stood for the proposition that when a custodial parent shows a good-faith, legitimate reason to move, courts ought to defer to the custodial parent's decision and ought not to reopen the custody determination. This formulation is not unlike that of the majority of states. See, e.g., *Ireland v. Ireland*, 717 A.2d 676, 684 (Conn. 1998) (custodial parent must prove relocation is for a legitimate purpose, then burden shifts to noncustodial parent to prove relocation is not in the best interests of the child); *In re Marriage of Burgess*, 913 P.2d 473, 482-83 (Cal. 1996) (change of custody not justified when custodial parent relocates for good faith reason);

*Holder v. Polanski*, 544 A.2d 852, 856 (N.J. 1988) ("any sincere, good-faith reason will suffice" to support custodial parent's decision to relocate).

We modified *Lane*'s holding in *deBeaumont*, 162 Vt. 91, 644 A.2d 843. There, a mother with sole custody provided generous visitation beyond what the divorce order required. As a result, when she sought to relocate with the children, this Court relied on the de facto "shared custody" arrangement that had evolved since the divorce to find that the mother's move was a changed circumstance. See *id.* at 98, 644 A.2d at 847. Thus, *deBeaumont* established that the de facto custodial arrangements should control the court's analysis, rather than a schedule outlined in a court order. See *id.* at 96, 98 & n.3, 644 A.2d at 845, 847 & n.3.

In this case, we have the reverse situation from *deBeaumont*. The parties moved from a shared custody arrangement to a de facto custodial parent with visitation with the noncustodial parent. As noted above, this was due to father's change of job, with a subsequent limitation on the time he could spend with the children. Like the parties in *deBeaumont*, no change to the divorce order was ever made; the parties simply acquiesced in the change.

The change is critical, however, because under *Lane*, the noncustodial parent challenging the move of a custodial parent must show that the move would so undermine the best interests of the children that a transfer of custody is necessary. See *Lane*, 158 Vt. at 499, 614 A.2d at 792. Assuming, under our current law, that a move out of state by one parent automatically triggers the threshold for changed circumstances and a reconsideration of custody, the father was required to make a showing that the move was so detrimental as to require a transfer of custody. Father did not make a showing that came close to meeting this burden. Father's evidence, aside from providing evidence of the schedule of childcare that was consistent with mother's, was devoted to rehashing issues of the divorce, reciting incidents of mother's conduct from many years earlier, expressing his "feeling" that mother was not as involved as she could be with one of the twin's baseball games, his dissatisfaction with the move, and his refusal to mediate. Having made no showing, the father's motion should have been denied.

Even if we considered this case to present one of joint custody, in which each parent's time with the children was sufficient to trigger reconsideration of custody in the face of a move by one of the parents, the court's failure to consider mother's evidence deprives us of

comparison between the parents, which is required before we affirm the court's holding.

## II.

Notwithstanding the trial court's errors in the findings and the current state of law under our relocation decisions, this case illustrates what is wrong with the way we are deciding relocation cases. We are trying to force them into the general structure of custody modification, in which we require the party requesting modification to show a substantial and unanticipated change in circumstances and then to show that the best interests of the child demand the requested change. This modification structure is designed to compare the status quo, which the court or the parents had previously decided was in the best interests of the children, with the requested change, usually sole custody with one parent. The problem in relocation cases is that the status quo is no longer possible — one parent is moving out of the area. The choices are therefore limited to giving one parent sole or primary custody of the children. But leaping directly to the question of what serves the best interests of the children ignores some threshold questions that should be asked about a relocation, about the good faith and legitimacy of the move, and the normal modification structure does not accommodate these questions.

Unfortunately, to solve this conundrum, trial courts have looked for "fault," for someone to blame. That someone is usually the relocating parent, either because the parent wanting to move is seen as rejecting the joint custody arrangement or because bad faith toward the remaining parent's custodial rights is presumed. Thus, the negative inference drawn against the relocating parent shows up in the analysis of the factors provided by 15 V.S.A. § 665 as failure to foster a relationship with the other parent, as evidenced by the rejection of joint parenting, or as a concern that the child's relationship with the community or even the house in which he or she was raised is too strong to permit adjustment to a new community, or sometimes as an overemphasis on the role of extended family versus parents. If the relocation involves a new spouse or job, it can be negatively interpreted as evidence that the parent places his or her own needs before the needs of the child. All of these inferences are unfair because custody of children is not a prize to be awarded to the parent with clean hands.

The result is that we are sanctioning, if not requiring, a redetermination of custody in every case in which a parent seeks to relocate

and, in the process, making unfair assumptions against the parent desiring to relocate. Not only is it a waste of judicial time and resources to make a second determination of custody in many cases, but this analytical framework does not ask the right questions. It does not plainly inquire into the good faith of the parents, either in proposing or opposing the move; it does not provide any way for trial courts to evaluate the legitimacy of a proposed move or the reasonableness of the location chosen. It fails to clearly identify and rely upon past caretaking patterns, and it does not protect against negative inferences drawn against the relocating parent. As an appellate court, we ought to recognize that this approach is not working and provide guidance toward a better system.

In fact, a better system has been devised. The standards proposed by the American Law Institute in its Principles of the Law of Family Dissolution (hereafter ALI Principles) thoughtfully consider the risks and rights at issue in relocation cases. Principles of the Law of Family Dissolution: Analysis and Recommendation (ALI, Tentative Draft No.3, March 20, 1998). ALI Principles outlines a way to resolve custody cases that preserves the requirement of changed circumstances and prevents disruption in the relationships between parents and children, but weights the analysis to prevent the even greater disruption of a change in custody. ALI Principles focuses on the actual caretaking patterns of parents and inquires into the parents' good faith when moving or opposing a move. It does not permit a presumption to be drawn against the relocating parent.

ALI Principles has been referred to as "a model statute for the dissolution of marriage." See J. Oldham, *ALI Principles of Family Dissolution: Some Comments*, 1997 U. Ill. L. Rev. 801, 801 (1997). The ALI describes its work as "the application of analytic power to reveal central conceptual problems in existing law and to solve them with a clearheaded and elegant proposal." I. M. Ellman, Chief Reporter's Preface, ALI Principles, *supra*, at xiii-xiv. As one commentator put it, "[t]he *Principles* contain forward-thinking guidelines to govern the allocation of custodial and decisionmaking responsibility between parents." M. Weiner, *Domestic Violence and Custody: Importing the American Law Institute's Principles of the Law of Family Dissolution into Oregon Law*, 35 Willamette L. Rev. 643, 644 (1999). A law professor has praised ALI Principles as "a work in progress, engaging the thought and time of many scholars, practitioners and judges. . . . It is a serious attempt by the ALI to grapple with the complexity of the best interest standard and to bring to the analysis

the accrued wisdom of experience." B. Woodhouse, *Child Custody in the Age of Children's Rights: the Search for a Just and Workable Standard*, 33 Fam. L.Q. 815, 830 (1999). In short, ALI Principles is a touchstone that can inform our decision-making because it asks the right questions.

## A. De Facto Arrangements

I will lay out the points on which ALI Principles offers an improved analysis for relocation cases. First, the underlying premise of the ALI's relocation section is that "[t]he ability to change one's area of residence is an important individual right." ALI Principles, *supra*, § 2.20, cmt. a. Cf. *Lane*, 158 Vt. at 485, 614 A.2d at 789. Indeed, the right to travel is a right of constitutional dimensions. See *In re Custody of D.M.G.*, 951 P.2d 1377, 1385 (Mont. 1998) (citations omitted); *Jaramillo v. Jaramillo*, 823 P.2d 299, 305 (N.M. 1991) (relocating parent's right to travel is "so deeply ingrained in American constitutional law that it . . . needs no elaboration"); *Watt v. Watt*, 971 P.2d 608, 616 (Wyo. 1999). As these and many other courts have observed, the right of a custodial parent to move with his or her children cannot lightly be circumscribed by the wishes of the noncustodial parent. While it may seem obvious, it is important to make explicit the significance of this right to prevent the relocating parent from being perceived in a negative light, as we have seen too often.

The starting point of the ALI's relocation analysis is whether the move impairs the relationship between a parent and the child.[6] This is appropriate, as the court's inquiry should be about the child's relationship to a parent, not the parent's location. This initial question immediately focuses the inquiry on the amount of custodial responsibility a parent has been exercising. The relationship between a parent and child is not defined by what may be set out in a custody or divorce decree, when the arrangements made between parents and children may differ markedly from the order. Instead, the ALI insists that the relationship be evaluated and defined by patterns of actual contact, or actual caretaking, rather than the theory embodied in a court order. In this way, ALI Principles acknowledges that the de facto arrangements for caring for a child may change over time and

---

[6] "(1) The relocation of a parent constitutes a substantial change in the circumstances under § 2.18(1) of the child only when it significantly impairs either parent's ability to exercise responsibilities that parent has been exercising." ALI Principles, *supra*, § 2.20(1).

may differ from the plan outlined in a divorce decree or court order. Throughout the draft, the ALI relies on the de facto or acquiesced-in arrangement to determine past caretaking patterns. See, e.g., ALI Principles, *supra*, § 2.19(2)(a), at 331. ALI Principles provides that any significant impairment of one parent's custodial responsibility justifies review of the custody arrangement. This provision is essentially a requirement of changed circumstances, specifically tailored to the context of a relocation case.

## B. Primary Parent

Next, ALI Principles addresses the situation that brings many relocation cases to court, where the relocation will markedly change the type and/or frequency of contact between children and one parent.[7] The analysis of these situations is centered on several issues, to be dealt with before reaching the best interests inquiry. First, ALI Principles asks whether the relocating parent has been exercising a significant majority of custodial responsibility for the child. The comments explain that the provision is intended to identify situations where

> an impairment of the relationship between the child and the parent having the most custodial time . . . can be reason-

---

[7] (4) When the relocation constituting changed circumstances under Paragraph (1) renders it impractical to maintain the same proportion of custodial responsibility as that being exercised by each parent, the court should modify the parenting plan in accordance with the child's best interests . . ., and in accordance with the following principles:

(a) A parent who has been exercising a significant majority of the custodial responsibility for the child should be allowed to relocate with the child so long as that parent shows that the relocation is in good faith for a legitimate purpose and to a location that is reasonable in light of the purpose. The proportion of custodial responsibility that constitutes a significant majority of custodial responsibility should be established through a rule of statewide application. A relocation is for a legitimate purpose if it is to be close to significant family or other support networks, for significant health reasons, to protect the safety of the child or another member of the child's household from a significant risk of harm, to pursue a significant employment or educational opportunity, or to be with one's spouse [or spouse equivalent . . .] who is established, or who is pursuing a significant employment or educational opportunity, in another location. The relocating parent has the burden of proving the legitimacy of any other purpose. A move with a legitimate purpose is reasonable unless its purpose is shown to be substantially achievable without moving, or by moving to a location that is substantially less disruptive of the other parent's relationship to the child.

*Id.* § 2.20(4)(a), at 340.

ably assumed, in most cases, to exceed the impairment of the relationship between the child and the other parent. A simple majority of 51 percent is not enough to trigger the substantial latitude this section extends to the relocating parent. A percentage between 60 and 70 percent would be reasonable.

*Id.* § 2.20, cmt. d., at 348.

This language acknowledges what is unspoken in many custody decisions, that most divorces result in an arrangement in between "sole custody" and "joint custody." See P. Markert, *Custody Relocation: More Questions than Answers Result from High Court Opinions in California and New York*, 38 Santa Clara L. Rev. 521, 549 (1998); see also M. Melli, P. Brown & M. Cancian, *Child Custody in a Changing World: A Study of Postdivorce Arrangements in Wisconsin*, 1997 U. Ill. L. Rev. 773, 778, 779 (form of "joint custody" that is now 81% of cases usually involves arrangements where parents share legal custody and therefore share decision-making but child lives with mother and has visitation with father). These so-called "shared parenting" arrangements involve joint legal custody and physical placement with each parent, but not equal amounts of time spent with each parent. "One parent is responsible for most of the primary caretaking responsibilities" in these "less than equal" situations. Markert, *supra*, at 549. We should recognize the new forms of relationships that are emerging through the divorce and custody process and provide workable standards tailored to address the strains in those relationships. The ALI standards help clarify that although we may not see a custodial and a noncustodial parent, it may nonetheless be the case that the children are closer to and more dependent upon one parent than the other. This parent could be called the primary parent, but what is most important is to recognize the importance of the relationship between the children and the primary parent, however that person may be designated. The ALI standards offer a procedure for how to provide that recognition.

## C. Good Faith

Next, and of chief importance in these frequent relocation cases, is the ALI's requirement that the court consider the good faith of the parents. Section 4(a) specifically directs the court to determine whether the parent wishing to relocate is acting "in good faith." ALI Principles, *supra*, § 2.20(4)(a), at 340. The ALI goes on to ask

whether the move is for a legitimate reason and to a location that is reasonable in light of that purpose. Significantly, it is this good faith inquiry for which our trial courts have been lacking a structure. We have failed to give guidance, as so many other states have already done, that shows trial courts how and when to consider the good faith of the parents. Concern for parental good faith is seen in one of the early leading relocation cases, *D'Onofrio v. D'Onofrio*, 365 A.2d 27, 30 (N.J. Super. Ct. 1976). There, the court provided five factors to be used in considering relocation cases, including "the integrity of the motives of the custodial parent in seeking the move" and "the integrity of the noncustodial parent's motives in resisting the removal." *Id.* at 30.

Many courts have since incorporated the "good faith" issue into their own multi-factored analyses. See, e.g., *In re Marriage of Burgess*, 913 P.2d at 482 (move does not warrant change of custody simply because custodian has chosen "for any sound good faith reason" to relocate); *Ireland*, 717 A.2d at 680 ("A growing number of states now presume, however, that the custodial parent's good faith decision to relocate *is* in the best interests of the child.") (emphasis in original); *Mize v. Mize*, 621 So. 2d 417, 419 (Fla. 1993) (custodian desiring to move "'for a well-intentioned reason'" rather than a vindictive desire to interfere with other parent's visitation rights should be permitted) (quoting *Hill v. Hill*, 548 So. 2d 705, 707-08 (Fla. Dist. Ct. App. 1989)); *Stout v. Stout*, 560 N.W.2d 903, 909 (N.D. 1997) (good faith of moving parent is a factor to be considered); *Schwartz v. Schwartz*, 812 P.2d 1268, 1271 (Nev. 1991) (factors to be considered include whether parents' motives in moving or opposing move are "honorable"); *Holder*, 544 A.2d at 856 (holding any good faith reason to move will satisfy custodian's showing); *Tropea v. Tropea*, 665 N.E.2d 145, 151 (N.Y. 1996) (factors include good faith of parents, both proposing and opposing move); *Taylor v. Taylor*, 849 S.W.2d 319, 332 (Tenn. 1993) (moving custodian's burden satisfied by showing of good faith reason for move and prima facie showing that move comports with child's best interests); *Love v. Love*, 851 P.2d 1283, 1288 (Wyo. 1993) (court will consider whether relocation is legitimate, sincere, in good faith and whether reasonable substitute visitation is possible).

As mentioned above, in the absence of any explicit direction or context for considering the good faith of the parents, Vermont trial courts have been unable to deal directly with this issue and, thus, the concern expresses itself in many indirect ways, such as judgments

about one parent's willingness to promote the children's relationship with the other parent, or a child's ability to adapt to a new circumstance. Better that we make explicit the critical issue of good faith, which helps to establish that there are good faith reasons to move, and that parents should not be presumed to be acting wrongfully or vindictively in wanting to relocate.

## D. Legitimate Purposes to Relocate

ALI Principles's express recognition of a number of "legitimate" purposes for relocation furthers the goal of preventing negative inferences drawn against relocating parents. The ALI section offers the judgment that:

> A relocation is for a legitimate purpose if it is to be close to significant family or other support networks, for significant health reasons, to protect the safety of the child or another member of the child's household from a significant risk of harm, to pursue a significant employment or educational opportunity, or to be with one's spouse [or spouse equivalent . . .] who is established, or who is pursuing a significant employment or educational opportunity, in another location. The relocating parent has the burden of proving the legitimacy of any other purpose.

ALI Principles, *supra*, § 2.20(4)(a), at 340. While this list of legitimate purposes may not be exhaustive and future cases could establish other presumptively legitimate purposes, this list is certainly a place to begin. It conserves judicial resources by preventing time-consuming litigation on the reason for the move, where the reason is one enumerated above. The comments to this section clarify that where the parent is relocating for one of the purposes enumerated in § 2.20(4)(a), these guidelines "relieve[] the relocating parent of the burden of convincing the court" that their purpose is legitimate. *Id.* cmt. d., at 349. Therefore, if a parent has been exercising a significant majority of custodial responsibility and the move is in good faith, then "no further analysis is required." *Id.* This approach allocates judicial resources efficiently by taking certain issues off the discussion table, such as whether a move can ever be in good faith and whether certain purposes are legitimate, thus allowing courts to use their time wisely in other areas.

Finally, ALI Principles turns to the issue of relocation where the parents are joint custodians, neither exercising a significant majority

of custodial time.[8] Again, ALI Principles returns to the inquiry of good faith, and then asks whether the relocation is for a legitimate purpose and is to a reasonable location in light of that purpose. If these queries are satisfied, then the court must allocate custodial responsibility in light of the best interests of the child, using all relevant factors, including the advantages and disadvantages of the relocation. The court must compare the situation of the children if custodial responsibility is allocated to either parent; the court cannot require the parties to maintain the status quo. Thus, the situation of the relocating parent is compared to the situation of the remaining parent, assuming each one has sole (or primary) custody. The court is to consider all "relevant factors" including the potential benefits of the relocation and the disruption inherent in both situations. Any award of sole custody from a joint custody situation will result in changes for the children.

Incorporating factors such as these into our analysis of relocation cases is consistent with the legislature's statutory scheme and our previous relocation decisions. The statute requires that a modification of custody must be based upon a "real, substantial and unanticipated change of circumstances" and "in the best interests of the child." 15 V.S.A. § 668. We modified this two-step test in *Lane*, 158 Vt. at 489, 614 A.2d at 786. There, we held that where a custodial parent wants to relocate and the noncustodial parent shows changed circumstances, the noncustodial parent must *further* show that the move would so undermine the best interests of the children that a transfer of custody is necessary. See *id.* at 499, 614 A.2d at 792. *Lane* thus added an intermediate step, a showing by the parent challenging the move as to the effects of the relocation on the children, such that the children's best interests can only be served by transferring custody to the remaining parent.

This step, considering the impact of relocation, is broadly worded and apparently provides scant guidance to trial courts on how to evaluate a relocation. The parents attempting to make such a showing have little guidance regarding what factors carry weight in this inquiry. I propose to use the ALI Principles to fill in the blank. Once

---

[8]"(b) If a relocation of a parent is in good faith for a legitimate purpose and to a location that is reasonable in light of the purpose, and if neither parent has been exercising a significant majority of custodial responsibility for the child, the court should reallocate custodial responsibility based on the best interests of the child, taking into account all relevant factors including the effects of the relocation on the child." *Id.* § 2.20(4)(b), at 341.

changed circumstances have been shown, there are a series of other questions that should be asked, prior to reopening the best interests of the children analysis: Is the moving parent acting in good faith? Is the opposing parent acting in good faith? Is the move for a legitimate purpose? Is the proposed location reasonable with respect to the stated purpose? And, rather than limiting the trial courts to the clumsy terms of "custodial parent" and "noncustodial parent," we ought to provide a working standard such as a parent exercising a significant majority of custodial responsibility. This means a parent who has custodial responsibility at least 60 percent of the time.[9]

What we did in *Lane* was no more and no less than what an appellate court should do. There, we provided guidance consistent with the statutory framework and interpreting that framework. What I propose here is neither novel nor inappropriate in our role as an appellate court.

In this case, because the court relied on finding that father had a fractional majority of custodial time and then failed to consider mother's situation on an equal footing, I cannot tell which of the ALI rules ought to apply. If, as she contends, and as the evidence suggests, she was the custodial parent, the court should have accorded deference to her decision to relocate, as outlined in ALI Principles and as required by *Lane*. See also *McCart v. McCart*, 166 Vt. 629, 630, 697 A.2d 353, 354 (1997) (mem.) (trial court cannot substitute its judgment for that of custodial parent choosing to relocate).

If, on the other hand, the parents truly shared joint custody, then the court should have moved from establishing the fact of joint custody to inquire into the good faith and legitimacy of the move. Only at that point should the court have engaged in a de novo review of the children's best interests. Although the trial court here did reference the statutory factors regarding the best interests of the children, its findings are deeply and unmistakably erroneous, and deprived mother of a fair hearing. The scope and significance of the lower court's errors requires reversal under any standard we might use.

---

[9] Another useful way to distinguish between situations of truly joint parenting and situations of shared parenting not rising to the level of equal parental responsibility is to look at who assumes responsibility for certain parental functions. Parents may spend almost equal amount of time with their children but only one parent may assume the responsibility to be "available in the event of medical emergencies, conferences with teachers, medical appointments, social activities, such as school events or sports, and any other situation[] that either parent would be expected to attend if the family [were] still intact." Markert, *supra*, at 551. If one parent assumes more of these parental responsibilities, then despite equivalent time spent with children, that parent may be the primary parent in a shared parenting arrangement, not a joint parenting situation.

### III. Conclusion

We live in a mobile society where relocation of residence for all sorts of legitimate purposes is commonplace. Relocation may be even more common in divorced families because it is often remarriage or new relationships that create the desire or necessity to move. As we recognized in *Lane*, allowing new families to flourish is in itself conducive to the best interests of the children involved. See *Lane*, 158 Vt. at 498, 614 A.2d at 791. If we are to treat parents fairly, giving due regard to the rights of each, we have to stop punishing the relocating parent with the loss of his or her children when the move is legitimate. And we need to have some predictability from family court to family court as to how the move will be evaluated, if challenged. The ALI Principles provide reasonable principles that would bring some coherence and predictability to our jurisprudence. We should offer the trial courts a set of factors that encourages them to ask the right questions in order to determine the best interests of children in Vermont. I am authorized to state that Justice Skoglund joins in this dissent.